**Application of Rolf-Ortwin WEBER, Alfons Soder and Istuan Boksay.**

**Appeal No. 77–622.**

United States Court of Customs and Patent Appeals.

June 30, 1978.

David R. Murphy, Arlington, Va., attorney of record, for appellants, Charles A. Wendel, Harold C. Wegner, Arlington, Va., on behalf of the Patent, Trademark and Copyright Section, Virginia State Bar.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents.

Fred E. McKelvey, Woodbridge, Va., for the Patent and Trademark Office.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This appeal is from a decision of the United States Patent and Trademark Office (PTO) Board of Appeals (board) affirming the examiner's rejection of claims 1–6 "as being improper Markush claims [1] and misjoinder under 35 USC 121." [2] The board also dismissed, for want of jurisdiction, the appeal of claims 8–13, 16, 17, 20, 22 and 23 in that the claims "were withdrawn from

1. Section 706.03(y) (note 4, infra) of the Manual of Patent Examining Procedure (MPEP) provides guidance in the use of Markush format and is cited by the examiner in his Answer before the board. MPEP 803 (note 3, infra), which applies 35 U.S.C. § 121 to Markush

claims, is also cited by the examiner in his final office action.

2. Section 121 provides, in pertinent part:
   *Divisional applications*
   If two or more independent and distinct inventions are claimed in one application, the

**456**

consideration since they were directed to non-elected inventions." We reverse and remand.

## Invention

The invention relates to cyclic diamine derivatives which possess the common property of psychotherapeutic effectiveness. The derivatives are identified by a single generic formula expressed in Markush format in representative claim 1:

1. A compound having the general formula

$$R_1 - \underset{\underset{X}{\|}}{C} - N \underset{(CH_2)_n}{\diagdown} N - Y - R_2$$

or an acid addition salt thereof in which formula $R_1$ is selected from the group consisting of

A) an at least mononuclear heterocyclic group having 4 to 10 carbon atoms in the ring system bound to the group $-\underset{\underset{X}{\|}}{C}-N$ through a carbon atom and containing at least one oxygen, nitrogen or sulphur atom,

B) substitution products of A) containing at least one substituent selected from the group consisting of halogen, trifluoromethyl, hydroxy, alkoxy of 1 to 3 carbon atoms, unsubstituted amino, amino substituted by up to two alkyl groups each having 1 to 3 carbon atoms and alkyl groups having 1 to 6 carbon atoms,

X is oxygen, sulphur or an NH-group,

Y is an alkylene group having 1 to 3 carbon atoms in the chain, or an alkylene group having 1 to 3 carbon atoms in the chain substituted by a) up to 3 alkyl groups each having up to 3 carbon atoms and a total of not more than 8 carbon atoms, or b) substituted by one or two phenyl groups,

> Commissioner may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application.

3. The examiner exercised his discretion under 922 O.G. 1016 which was a notice issued by the Commissioner on May 1, 1974, (now MPEP 803) which provides in part:

> A Markush-type claim is directed to "independent and distinct inventions," if two or more of its members are so unrelated and diverse that a prior art reference anticipating the claim with respect to one of the members would not render the claim obvious under 35 U.S.C. 103 with respect to the other member(s).
>
> [Paragraph 4.]
>
> If the claim is of that nature, the examiner is authorized to reject it as an improper Mar-

$R_2$ is selected from the group consisting of

C) an at least mononuclear carbocyclic or heterocyclic group having 4 to 10 carbon atoms in the ring system, containing but one heteroatom in a ring,

D) substitution products of C) containing at least one substituent selected from the group consisting of nitro, halogen, trifluoromethyl, alkyl having 1 to 6 carbon atoms, hydroxy, alkoxy having 1 to 3 carbon atoms, unsubstituted amino groups and amino groups substituted by up to two alkyl groups each having 1-3 carbon atoms,

$R_3$ is hydrogen or up to two substituents selected from alkyl groups having up to 2 carbon atoms and phenyl groups;

n is 2 or 3.

## Background

In the first office action dated January 17, 1974, the examiner "objected" to claims 1–6, 8–13 and 23 and required applicants to elect one of three groups of claims: group I (claims 7 and 14–22), group II (claims 8–13), or group III (claim 23). Applicants elected, with traverse, group I and brought to the examiner's attention his failure to include claims 1–6 in the groups. The status of claims 1–6 was clarified in the second and final action, dated December 26, 1974, in which those claims were "rejected." The examiner also stated that claim 1 embraced 24 enumerated independent and distinct inventions. The examiner, in conclusion, stated that:

> Markush claims 1 to 6 are rejected as being improper Markush claims and for misjoinder under 35 U.S.C. 121. (922 O.G. 1016, 4th and 6th paragraph).[3]

kush claim and for misjoinder under 35 U.S.C. 121 and to require the applicant to restrict the application to a single invention. In making such a requirement, the examiner will (1) clearly delineate the members or groups of members believed to constitute improperly joined inventions, and (2) state reasons fully explaining why they are independent and distinct. Applicant's response to such a requirement should be an election of a single adequately disclosed and supported invention, with or without restriction of the claim(s) to that invention. Of course, the response must not introduce new matter into the application. See 35 U.S.C. 132 and In re Welstead, 59 CCPA 1105, 463 F.2d 1110, 174 USPQ 449 (1972). A refusal to elect a single invention will be treated as a non-responsive reply.

If the members of the Markush group are sufficiently few in number or so closely related that a search and examination of the en-

In his Answer, the examiner expanded upon the basis of the rejection. He discussed MPEP 803, in particular the phrase "independent and distinct" of § 121 and applied the phrase to the claims. Continuing, the examiner discussed the Markush claims and stated:

> The compounds embraced do not have a common nucleus and are improperly Markushed under the criteria set forth in M.P.E.P. 706.03(y) * * *.4 * * * The specification discloses that certain compounds have activities not shared by all of the scope claimed * * *.

At the outset, the board decided that § 121 was an adequate legal basis for the examiner to reject a single claim "embracing" more than one independent and distinct invention. In support thereof, the board incorporated two board decisions [5] which discussed the interrelated rejections of "misjoinder under 35 U.S.C. 121" and "as being improper Markush claims" as applied here. The board analyzed the claims in light of those decisions and found them to contain multiple independent and distinct inventions.

Appellants argue before this Court that each of the claims is directed to but a single invention and § 121 is not a proper ground for rejection in any event.

---

tire claim can be made without serious burden, the examiner is encouraged to examine it on the merits, even though it is directed to independent and distinct inventions. In such a case, the examiner will not follow the procedure outlined in the preceding paragraph and will not require restriction. [Paragraph 6.]

Where the examiner has rejected the claim and required restriction and the applicant has responded without restricting the claim(s) to a single invention, the examiner shall, if the position is adhered to, again reject the claim and any other Markush claims not restricted to the elected invention. No further examination of these claims is required unless and until such rejection has been overcome. However, if the search of the single elected invention develops prior art which would render both the elected invention and the improper Markush claim(s) unpatentable, such prior art may be applied in rejections of both without a complete search of the subject matter of the improper Markush claim(s). Otherwise, only true generic claims and those restricted to the elected invention will be examined in the usual manner.

[Paragraph present in MPEP 803 deleted.]

Review of the rejection will be by appeal to the Board of Appeals under 35 U.S.C. 134.

4. MPEP 706.03(y) provides, in pertinent part:

Ex parte Markush, 1925 C.D. 126; 340 O.G. 839, sanctions, in chemical cases, claiming a genus expressed as a group consisting of certain specified materials. This type of claim is employed when there is no commonly accepted generic expression which is commensurate in scope with the field which the applicant desires to cover. * * *

* * * * * *

Where a Markush expression is applied only to a portion of a chemical compound, the propriety of the grouping is determined by a consideration of the compound as a whole, and does not depend on there being a community of properties in the members of the Markush expression.

When materials recited in a claim are so related as to constitute a proper Markush group, they may be recited in the conventional manner, or alternatively. For example, if "wherein R is a material selected from the group consisting of A, B, C and D" is a proper limitation then "wherein R is A, B, C or D" shall also be considered proper.

5. The board incorporated both Ex parte Dorlars, Appeal No. 148–56, decided May 2, 1975, reproduced in the record, and Ex parte Haas, 188 USPQ 374 (Bd.App.1975). The board stated in Dorlars that:

What we do find relevant is the single question: does the Examiner have legal authority to attack the propriety of an individual claim, whether of the Markush-type or otherwise, which includes a plurality of independent and distinct inventions? We think clearly the answer is "yes."

The board based its conclusion in Dorlars on § 121 and further stated:

Clearly the mere fact that review of decisions requiring restriction within a single claim is available under 35 USC 134, whereas decisions requiring restriction between claims are not, cannot serve to limit application of the statute. That relates only to the issue of jurisdiction to review; it has no bearing on the scope of the statute itself—on the scope of authority conferred.

In Ex parte Haas, the board decided that Rule 141, 37 CFR 1.141 regards an allowable generic claim as one that does not include more than one independent and distinct invention. The board decided that § 121 is a legal basis for rejecting a single claim as an improper Markush claim.

## OPINION

The board affirmed the examiner's rejection of claims 1–6 "as being improper Markush claims and misjoinder under 35 U.S.C. 121." However, the reasoning of the board shows that the analysis of the "improper Markush claims" rejection was to be supportive of the rejection under § 121 rather than alternative to it. We have jurisdiction over both rejections,[6] but since the Markush rejection is inextricably intertwined with the § 121 rejection, we make no decision on the propriety of the Markush rejection and remand to the board for its consideration. However, the result of any such consideration must be consistent with our analysis of an applicant's rights under the second paragraph of 35 U.S.C. § 112.

■ An applicant is given, by the statute, the right to claim his invention with the limitations he regards as necessary to circumscribe that invention, with the proviso that the application comply with the requirements of § 112. We have decided in the past that § 112, second paragraph, which says in part "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention," allows the inventor to claim the invention as he contemplates it. *In re Wolfrum*, 486 F.2d 588, 179 USPQ 620 (CCPA 1973).

■ As a general proposition, an applicant has a right to have *each* claim examined on the merits. If an applicant submits a number of claims, it may well be that pursuant to a proper restriction requirement, those claims will be dispersed to a number of applications. Such action would not affect the right of the applicant eventually to have each of the claims examined in the form he considers to best define his invention. If, however, a single claim is required to be divided up and presented in several applications, that claim would never be considered on its merits. The totality of the resulting fragmentary claims would not necessarily be the equivalent of the original claim. Further, since the subgenera would be defined by the examiner rather than by the applicant, it is not inconceivable that a number of the fragments would not be described in the specification.[7]

■ It is apparent that § 121 provides the Commissioner with the authority to promulgate rules designed to *restrict* an *application* to one of several claimed inventions when those inventions are found to be "independent and distinct." It does not, however, provide a basis for an examiner acting under the authority of the Commissioner to *reject* a particular *claim* on that same basis.

■ Even though the statute allows the applicant to claim his invention as he sees fit, it is recognized that the PTO must have some means for controlling such administrative matters as examiner caseloads and the amount of searching done per filing fee.[8] But, in drawing priorities between

---

**6.** 37 CFR 1.196(a) provides that in decisions of the board:

The affirmance of the rejection of a claim on any of the grounds specified constitutes a general affirmance of the decision of the primary examiner on that claim, except as to any ground specifically reversed.

See also *In re Sichert*, 566 F.2d 1154, 1164, 196 USPQ 209, 217 (CCPA 1977).

**7.** See *Fields v. Conover*, 58 CCPA 1366, 443 F.2d 1386, 170 USPQ 276 (1971), wherein a subgenus was not described and *In re Ruschig*, 54 CCPA 1551, 379 F.2d 990, 154 USPQ 118 (1967), wherein a species of a properly described genus was found not to be described.

**8.** We take notice of a practice formerly utilized by the PTO and found in the MPEP:

705 Patentability Reports

Where an application, properly assigned to one examining group, is found to contain one or more claims *per se* classifiable in one or more other groups, which claims are not divisible *inter se* or from the claims which govern classification of the application in the first group, the application may be referred to the other group or groups concerned for a report as to the patentability of certain designated claims. This report will be known as a Patentability Report (P.R.) and will be signed by the primary examiner in the reporting group.

The report, if legibly written, need not be typed.

the Commissioner as administrator and the applicant as beneficiary of his statutory rights, we conclude that the statutory rights are paramount. We hold that a rejection under § 121 violates the basic right of the applicant to claim his invention as he chooses.

■ Appellants contend that the examiner's action in withdrawing claims 8–13, 16, 17, 20, 22 and 23 from consideration as drawn to nonelected inventions constitutes a rejection under the holding of *In re Haas,* 486 F.2d 1053, 179 USPQ 623 (CCPA 1973), and, therefore, the board improperly found a lack of jurisdiction. We do not agree. Clearly our decision in *In re Hengehold,* 58 CCPA 1099, 440 F.2d 1395, 169 USPQ 473 (1971), disposed of the theory that a restriction requirement and the subsequent action of the examiner in withdrawing nonelected claims from consideration,[9] *per se,* constitutes a rejection. An exception is found in *In re Haas,* supra, wherein we determined that the examiner's action in withdrawing claims was a rejection because the "claims were withdrawn from consideration not only in this application but prospectively in any subsequent application *because of their content.*" 486 F.2d at 1056, 179 USPQ at 625. (Emphasis ours.) We do not understand the PTO to make such a holding with respect to claims 8–13, 16, 17, 20, 22 and 23, nor that appellants argue that the PTO does so. Indeed, we note that appellants admitted in their brief before the board that claims 8–13 and 23 were "properly withdrawable." Consequently, the board's dismissal of the appeal to claims 8–13 and 23 was correct. The Commissioner's brief admits that claims 16, 17, 20 and 22 contain species of the invention of generic claim 1 and would be provided an examination on the merits should the § 121 rejection be reversed. We remand for appropriate action on claims 16, 17, 20 and 22, and dismiss

the appeal of claims 8–13 and 23 for lack of jurisdiction.

The decision of the board affirming the rejection under § 121 is *reversed,* and the case is *remanded* for consideration of the "improper Markush" rejection of claims 1–6 and appropriate action on claims 16, 17, 20 and 22. The appeal of claims 8–13 and 23 is *dismissed* for lack of jurisdiction.

*REVERSED AND REMANDED.*

RICH, Judge, concurring.

I concur in the result reached in the main opinion, but there are a few points I wish to make clear.

35 U.S.C. § 121 deals with a matter of PTO practice known as "requirements for division" prior to the 1952 Patent Act which, for the first time, provided a statutory provision on this subject. It did so, under the heading "Divisional Applications," by giving the Commissioner a discretionary, unappealable power to *restrict* an application to one of several *claimed* inventions when those inventions were found to be "independent and distinct." 35 U.S.C. § 121, first sentence; see also P. J. Federico, "Commentary on the New Patent Act" 35 U.S.C.A. p. 1, at p. 34 (1954).

Ever since *Ex parte Eagle,* 1870 C.D. 137 (Com'r. Pats.1870), at least, the expression used in § 121, "two or more * * * inventions are claimed," has connoted separate claims to separate inventions. It has no reference to generic or broad claims which "embrace" (the term used by the examiner and the board herein) or "cover" (the term used in the solicitor's brief in support of the board) two or more inventions. Section 121 nowhere uses the words "embraced" or "covered." It says "claimed," and that I take to mean what it has always referred to in the terminology

---

Note that the Patentability Report practice is suspended, except in extraordinary circumstances. See § 705.01(e).

We further note the authority of the Commissioner under 35 U.S.C. § 41(b) to "establish charges for * * * services furnished by the Patent and Trademark Office."

**9.** 37 CFR 1.142(b) provides:

(b) Claims to the invention or inventions not elected, if not canceled, are nevertheless withdrawn from further consideration by the examiner by the election, subject however to reinstatement in the event the requirement for restriction is withdrawn or overruled.

of the patent law, a "claim" or definitional paragraph which, in the words of § 112, second paragraph, is "particularly pointing out and distinctly claiming the subject matter the applicant regards as his invention."

Dealing, as it does, with requirements for restriction, § 121 says nothing whatever about the rejection of claims, a matter entirely separate from restriction. For one thing, rejections are appealable to the board and restriction requirements are not. Federico, op. cit. p. 34; 37 CFR § 1.144.

On this appeal from the rejection of claims 1–6 we do not have before us a restriction requirement under § 121. Such a requirement would not have been appealable to the board. We have before us an appeal from affirmance of a *rejection.* The examiner purported to base it on § 121 and the board accepted that theory, citing in support its own prior decision in *Ex parte Haas,* 188 USPQ 374, wherein it had said, "we believe the referred to section of the patent statute [§ 121] does provide a basis for such a rejection," namely, a rejection of a *single* claim "drawn to a multiplicity of independent and distinct inventions."[1]

In dealing with claims 1–6, in spite of the fact there are multiple claims, we are not dealing with separate claims to separate inventions. Claim 1 is a generic claim and claims 2–6 are dependent thereon. They are all *generic* claims but of varying scope. They are treated together and *each* claim is rejected on the same ground, as being drawn to multiple allegedly independent and distinct inventions. Careful review of all statements by the examiner and the board makes it clear beyond question that the only basis asserted for rejecting claims 1–6 is that they cover or embrace or are directed to a plurality of independent and distinct inventions, and this is the sole reason given for saying they are "improper Markush claims" or for saying there is "misjoinder [of inventions] under 35 USC 121." Section 121 is asserted as the *only* legal basis for this rejection.[2]

The practice here challenged is tantamount to a refusal by the PTO *to examine* a single Markush claim in a single application because, in its opinion, it is *broad* enough to "embrace" or "cover" a plurality of inventions which, if presented separately, would be separately patentable, *assuming* any one of them to be prior art.[3] The label it attaches to such a broad claim is "improper Markush" and the situation is described as "misjoinder."

The fault in the PTO position is that it overlooks the obvious fact that almost any reasonably broad claim "embraces" or "covers" a multiplicity of inventions, in the sense of "dominating" them, which inventions might be separately patentable if and when presented in separate applications. Logically, this is not a sufficient excuse for refusing to examine a claim on its merits for compliance with 35 U.S.C. §§ 101, 102, 103, and 112. None of those statutory sections, of course, justifies a refusal to examine.

The only justification or statutory authority put forward for refusing to examine is 35 U.S.C. § 121. There is nothing therein, however, to excuse a refusal to examine an elected invention or an applicant's generic (broad) claim reading thereon, notwithstanding the generic claim reads on nonelected inventions and possibly many others, all potentially separately patentable. The PTO's own rules recognize the distinction between generic claims and separately

---

1. Even the dissenting member of the board, who felt the "Markush" claims there involved were not to "independent and distinct" inventions, agreed that § 121 was a proper "legal basis" for a rejection.

2. In addition to § 121, the examiner relied on the Commissioner's notice published May 1, 1974, in 922 O.G. 1016, now MPEP 803, as authorizing the rejection. That notice also, and solely, relies on § 121 for authority. In view of our decision here, it is obvious that the substance of the notice and the MPEP provision corresponding to it are as lacking in foundation as the rejection we are reversing.

3. This is the essence of the *test* for independence and distinctness set forth in the third paragraph of the Commissioner's notice of May 1, 1974, in determining whether the examiner has authority to *reject* a claim, under the fourth paragraph of the notice.

patentable inventions encompassed or covered thereby. 37 CFR § 1.141 deals *explicitly* with "independent and distinct inventions"[4] even permitting five of them to be patented on one application along with a generic claim. As to species in excess of five specifically claimed, it is implicit that they may still fall within the "coverage" of the generic claim even if separately patented. It is elementary patent law that the number of "species" "covered" by a patent having a generic claim is virtually without limit notwithstanding the limitation of Rule 141 to five species "specifically claimed." So the discretionary power to limit one application to one invention is no excuse at all for refusing to examine a broad generic claim—no matter how broad, which means no matter how many independently patentable inventions may fall within it.

Of course a broad claim may be unpatentable for any number of reasons, but we are not here dealing with a question of patentability under the statute but with a refusal to examine.

The only basis here claimed in support of the labels "improper" and "misjoinder" is the scope of the claim. That is not sufficient excuse.

As for the true meaning of the words "two or more independent and distinct inventions are claimed" in § 121, being based—as they were—on the "division" practice existing in the then Patent Office in 1952, there can be no doubt they refer to separate inventions separately claimed and to a requirement to put separate claims in separate applications or at least to restrict one application to one claimed invention. There is no indication that enactment of § 121 contemplated refusing examination to generic claims because of their scope or that applicants were to be denied the right to present single claims of any breadth they chose and have them examined.

The PTO effort of the past few years to justify its refusal to examine by issuing a "rejection" pursuant to the May 1, 1974,

notice (MPEP 803) on the basis of § 121 is mere semantic gamesmanship.

With respect to the remand to consider the "improper Markush" rejection of claims 1–6, it is my view, based on careful analysis of the rejections actually made, that the PTO, following the May 1, 1974, notice (922 OG 1016), created a new kind of "improper Markush" rejection based on 35 U.S.C. § 121 which we are reversing. There remains, however, a vast body of precedent antedating the 1974 notice on what proper "Markush" claims are. As I understand the majority's remand, it is for the purpose of examining claims 1–6 under the pre-notice law relating to Markush practice in the process of examining these claims on their merits. Until now, such examination has been refused because they "cover" or "embrace" too much, a basis of *rejection* we find impermissible.

---

4. Note Rule 141's wording: "Two or more independent and distinct inventions may not be claimed in one application, *except * * *.*"

(My emphasis.) Compare the wording of 35 U.S.C. § 121.